UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:

JNL FUNDING CORP.,

                              Debtor.

--------------------------------------------------------X

Chapter 11
Case No.: 10-73724-AST

## DECISION AND ORDER
## EXPANDING THE POWERS OF COURT APPOINTED EXAMINER

### Procedural Background

On May 14, 2010 (the "Petition Date"), Debtor, JNL Funding Corp. ("JNL") filed a

petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et*

*seq*. (the "Bankruptcy Code").[1]   JNL is a specialized real estate finance company which

originates and invests in a diversified portfolio of first mortgage assets in the residential real estate

market. [dkt item 17]   JNL is a "hard money" lender investing primarily in real estate related first

mortgages and construction loans, making loans secured by first priority mortgages primarily on

single family and multi-family residential real properties.   JNL's loans typically are made to real

estate investors seeking to purchase and renovate properties for investment purposes.   Most of

JNL's loans are made to repeat customers who have multiple loans from JNL at any given time.

JNL's recent loans typically bear interest at the rate of 14% *per annum*, and JNL typically receives

four (4.0) percentage points for originating the loan.   JNL was incorporated in 2002, prior to

which time JNL's principal, Mr. Forgione, operated a similar business through a d/b/a he called

JNL Funding.

---

[1]  Also on the Petition Date, JNL's principal, Joseph Forgione, filed his own voluntary petition, which has been
assigned case number 10-73726-ast (the "Individual Case").

Prior to the Petition Date, Textron Financial Corporation ("TFC") as lender, and JNL, as borrower, had entered into a Loan and Security Loan Agreement dated as of August 18, 2006, under which TFC agreed to and did make certain prepetition revolving loans and other financial accommodations available to the JNL ("Agreement").   The Agreement was subsequently amended to include TD Bank North ("TD") as a participant lender (as amended, the "Loan Agreement" and collectively, the "Lenders").

On May 18, 2010, shortly after the Petition Date, JNL filed a motion seeking an order authorizing the use of cash collateral pursuant to 11 U.S.C. § 363 (the "Cash Collateral Motion"). [dkt item 7]

On May 20, 2010, TFC filed an objection to the Cash Collateral Motion. [dkt item 11]   In TFC's objection, it asserts that, as of the Petition Date, JNL was liable to the Lenders in the approximate aggregate principal amount of $31,168,105.72, plus any then outstanding interest, fees and expenses (collectively, the "Pre-Petition Obligations").   Also on May 20, 2010, an emergency hearing was held, at which time JNL was authorized to use cash collateral on an interim basis until a May 28, 2010, scheduled hearing ("May 28 Hearing").

Prior to the May 28 Hearing, JNL and TFC entered into an agreement extending JNL's use of cash collateral until July 2, 2010, on certain terms and conditions, and providing adequate protection for such use.[2]

On June 8, 2010, the United States Trustee ("UST") appointed an Official Committee of Unsecured Creditors ("Committee") pursuant to 11 U.S.C. § 1102(a)(1). [dkt item 30]

---

[2] The Court has scheduled various adjourned hearings on the Cash Collateral Motion, and either on the eve of or at all of these hearings, JNL and TFC have entered into various agreements extending JNL's use of cash collateral. These agreements, generally not exceeding 60 days, have been memorialized by stipulated orders.   In certain instances, limited issues have been presented for the Court to determine, such as who may serve as an appraiser, whether certain loans could be closed, and Mr. Forgione's compensation.

On June 21, 2010, TFC filed an "Emergency Motion" seeking the appointment of a Chapter 11 trustee, pursuant to 11 U.S.C. § 1104(a) (the "Trustee Motion"). [dkt item 38]   TFC alleged, *inter alia*, that JNL, by and through Forgione, engaged in "seriously misleading and perhaps fraudulent activities and transactions with insiders, affiliates and other related and unrelated third parties, all of which provided no identifiable, tangible or intangible benefit or consideration to the Debtor or its creditors."   TFC further alleged that JNL had engaged "in a ponzilike scheme designed to use the Debtor as a means to divert literally millions of TFC loan proceeds, and perhaps millions more in proceeds of 'loans' from so-called 'investors', to his personal benefit, all at the expense of the Debtor's creditors." [dkt item 38 ¶1]

On July 1, 2010, this Court held a status conference on the Trustee Motion.   As the result thereof, this Court entered a scheduling order on the Trustee Motion, setting a trial on the Trustee Motion for July 23, 2010, along with a trial on the Cash Collateral Motion, and setting various discovery deadlines incident thereto. [dkt item 60]

On July 1, 2010, TFC filed a motion to disband the Committee (the "Committee Motion"). [dkt item 57]

On July 30, 2010, the Court entered an Amended Scheduling Order setting various deadlines for discovery, and scheduling a trial on the Trustee Motion and the Cash Collateral Motion to begin on August 25, 2010 (the "Amended Scheduling Order"). [dkt item 96]   A trial on the Committee Motion was also set for August 25, 2010.

On August 9, 2010, JNL filed an emergency motion seeking to adjourn the trial date of the Trustee Motion and setting new discovery deadlines (the "Adjournment Motion"). [dkt item 103]

On August 10, 2010, this Court entered an Order scheduling certain deadlines with respect to JNL's Adjournment Motion. [dkt item 107]   JNL, TFC, and the Committee all filed papers concerning the Adjournment Motion.

On August 11, 2010, this Court entered an Order granting the Adjournment Motion in part, and vacated the Amended Scheduling Order as same related to the Trustee Motion (the "August 11 Order"). [dkt item 109]   As part of the August 11 Order, this Court also directed JNL to appear and show cause on August 25, 2010, why an examiner should not be appointed, and set certain deadlines for submission of pleadings related thereto.   The examiner's work was to be used by the Court for, *inter alia*, analysis of the Trustee Motion.

On August 20, 2010, JNL filed a response in support of the appointment of an examiner. [dkt item 134]   On August 23, 2010, the Committee and TFC also filed responses in support of appointment of an examiner. [dkt items 137, 138]   The parties, however, expressed disparate views on who should be appointed examiner.   The Committee requested that this Court appoint a CPA employed by its financial advisor and accounting firm, Marcum LLP ("Marcum"), as examiner. [dkt item 137 ¶ 13]

On August 26, 2010, this Court issued an Order directing that an examiner be appointed by the UST, and establishing the examiner's role as being to investigate and report on four primary issues regarding JNL's pre-petition activity (the "Appointment Order"). [dkt item 154] These issues are:

A.    Alleged transfers made to Forgione's personal accounts and to accounts of entities owned and/or controlled by Forgione, or parties related to Forgione, using the proceeds of TFC's revolving loan advances to Debtor;

B.    Alleged diversions by Forgione of millions of dollars of TFC's revolving loan advances to Debtor from Debtor's bank accounts to Forgione's personal accounts, allegedly denominated as "Forgione d/b/a JNL Funding," which funds were then

           allegedly used by Forgione to make payments to individuals or entities who allegedly made "loans" or "investments" to Forgione personally, as distinguished from loans to or investments in the Debtor;

C.      Alleged loans made by Debtor to its clients that were supposed to be supported by independent appraisals, but were not supported by legitimate appraisals; and

D.      Alleged loans made by Debtor of millions of dollars to entities allegedly owned and/or controlled by the Debtor and/or Forgione personally; these entities allegedly include, but are not limited to (I) Hampton Square Realty, LLC ("Hampton Square"); (ii) Windsor Development Corp. ("Windsor"); (iii) Quail Run Development Corp.; and (iv) Stoneleigh Woods at Carmel LLC.

[dkt item 154]   This Court also authorized an examiner to investigate other matters deemed "necessary and relevant to the complete and full investigation of the four enumerated areas[.]"[dkt item 154]

On September 7, 2010, this Court granted the UST's application to appoint Christopher G. Ellis as Examiner (the "Examiner"). [dkt item 160]   To assist the Examiner in carrying out his function, the Court ordered the parties to cooperate with the Examiner, and empowered the Examiner to conduct voluntary interviews, review documents, and issue Rule 2004 subpoenas for involuntary production and examinations.   This Court authorized the Examiner's retention of his financial advisory firm and a law firm. [dkt items 185, 189]

Following his appointment, the Examiner, with the assistance of his professionals, reviewed substantial documentation provided by TFC through a document repository, conducted interviews with several persons who formerly worked for JNL as well as various employees of TFC, conferred with parties in interest and their counsel, and conducted Rule 2004 examinations.

On September 15, 2010, this Court issued a Memorandum Opinion and Order denying TFC's Motion to disband the Committee. [dkt items 167-68]; *In re JNL Funding, Corp.*, 438 B.R. 356 (Bankr. E.D.N.Y. 2010).   In that decision, this Court noted that the documentary evidence

before the Court at that juncture conclusively established that no member of the JNL Committee held a promissory note or guaranty executed by JNL, and that each held a promissory note personally executed by Mr. Forgione.   Further, the trial evidence was clear that each Committee member was listed in JNL's Schedules as an investor, while being listed in the Schedules in the Individual Case as a lender, and in each instance for the same amount[3].   Finally, the trial evidence was clear that each Committee member is similarly situated to a number of the other persons listed on the 20 Largest List in JNL's case and the 20 Largest List in the Individual Case; each such person is listed as a creditor in both cases, yet holding only a promissory note from Mr. Forgione personally (collectively, the "Noteholders").   However, the Committee had asserted that although JNL, as a successor company to Mr. Forgione's DBA, JNL Funding, generally would not be liable for the debts of its predecessor, there are four exceptions to the general rule of non-liability which might render JNL liable to the Noteholders.[4]   This Court then noted that both the Committee and TFC overlooked the procedural setting of the Committee Motion, and that the Committee Motion was not the proper vehicle for adjudicating the substantive claims of each of the Noteholders, which issues were not then before the Court.   However, given the posture of the cases at that time, the Court also ordered the parties to show cause why the JNL case and the Forgione case should not be jointly administered with one unsecured creditors committee serving in both cases. [dkt item 168]

---

[3] JNL's Committee was comprised of members who were each listed on JNL's Amended Schedule F as the holder of a "contingent" claim, and the claim is listed as an "investor." These same members were also each listed on Schedule F in the Individual Case as the holder of a "contingent" claim, and the claim is listed as a "loan."

[4] The Committee asserted that such liability may arise: (1) when there is an express or implied agreement for the successor to assume the predecessor's debts; (2) when the circumstances surrounding the transaction warrants a finding of a consolidation or merger of the two corporations; (3) when the successor company is a mere continuation of the predecessor; or (4) when the transaction is entered into fraudulently for the purpose of wrongfully defeating creditors' claims. *See Colon v. Multi-Pak Corp.*, 477 F.Supp.2d 620, 626 (S.D.N.Y. 2007)(citing *Schumacher v. Richards Shear Co., Inc.,* 59 N.Y.2d 239, 240 (N.Y. 1983)); *accord Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592 (S.D.N.Y. 2007).

After a hearing on September 29, 2010, the Court issued an Order approving the Joint Administration of JNL's case and Forgione's case under case number 10-73724-ast on October 27, 2010. [dkt items 202, 204]

On October 28, 2010, the UST appointed a creditors committee in the jointly administered cases. [dkt item 203]   All of the members of the joint Committee are Noteholders.

On November 15, 2010, the Examiner issued a report of his findings (the "Examiner's Report"). [dkt item 209]   The Examiner's Report includes a scope of work performed, his observations, and his conclusions.   The Examiner stated in his Report that the time period of transactions he was investigating "runs from August 2006 until the Petition Date in May 2010 (the "Period")." [dkt item 209, p. 6]   Having investigated numerous transactions with numerous entities, the Examiner categorizes various entities into "Owned Affiliates," "Controlled Affiliates," and "Related Affiliates."[5]   The Examiner stated how he arrived at assigning these labels: "The first group of Owned Affiliates consists of entities in which Forgione or the Joseph G. Forgione 2003 Family Trust or Forgione family members hold an ownership interest." [dkt item 209, p. 23]   "The second group consists of entities that for one reason or another fall under the

---

[5]  The Examiner primarily based his definition of Affiliate on a definition in the TFC Loan Agreement:

> 'Affiliate' means, with respect to a Person, (a) any partner, shareholder or member (in each case, if holding more than five percent (5%) of the outstanding interest in such Person) of such Person, (b) any director, officer or managing agent of such Person, and (b) any other Person (other than a Subsidiary) that, (i) directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such given Person, (ii) directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting stock or voting partnership or other voting interest of such Person or any Subsidiary of such Person,or (iii) five percent (5%) or more of the voting stock or voting partnership or other voting interest of which is directly or indirectly beneficially owned or held by such Person or a Subsidiary of such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or voting partnership or other voting interest, by contract or otherwise.

[dkt item 209, pp.18-19] The Examiner then "identified a number of affiliated entities that either existed at the time the Loan Agreement was entered into with Textron and were not disclosed, or subsequently came into existence and were not disclosed as Affiliates." [dkt item 209, p. 19]

heading of controlled by or related to Forgione or the Debtor, and have some economic involvement (other than only as a borrower) with the Debtor during the Period." The Examiner considered as Related Affiliates those for which he "found no evidence of direct ownership by Forgione or the Debtor. . .." [dkt item 209, p. 24]

Included among the entities defined as an owned affiliate is the Joseph G. Forgione 2003 Family Trust ("Family Trust"). According to JNL, although Mr. Forgione was the sole shareholder of JNL and its President at inception, in 2008, "as part of an estate plan, Forgione formed the . . . Family Trust, an irrevocable trust of which Forgione's children are the beneficiaries." [dkt item 252 ¶17][6]

A status conference was held on December 1, 2010, at which the Examiner reported on his observations and conclusions. At that hearing, JNL, TFC, and the Committee asked for the ability to file responses to the Examiner's Report, given the Court's expressed intention to use the Report in determining the Trustee Motion. A deadline for submissions of late January 2011 was set, which deadlines were extended by the Court and/or by party stipulations. [dkt items 242, 245] In the interim, the parties attended a two-day mediation session, for which Chief Judge Craig of this Court served as mediator. Settlement did not ensue.

On January 21, 2011, the Committee filed a response to the Examiner's Report which, combined with attachments, exceeds 800 pages ("Committee Response"), which includes a report

---

[6] JNL further states:

> Forgione was never a trustee under the Trust and the trustee has no authority to make distributions to or as directed by Forgione. By agreement, dated May 1, 2008, between Forgione and the Trust, Forgione sold to the Trust 99 Class B non-voting shares of stock in JNL, representing 99% of the equity in JNL, for the sum of $12,078,000 payable in 100 quarterly installments, of interest only, at 4.21% per annum, commencing April 1, 2009 with the principal due January 1, 2034, evidenced by a promissory note, dated May 1, 2008, and secured by a security interest in the stock sold to the Trust. Forgione retained 1 Class A voting share of stock in JNL, thereby retaining control over the operations of JNL.

[dkt item 252 ¶17]

from its financial advisor, Marcum (the "Marcum Report"). [dkt item 248]   Also on January 21, 2011, TFC filed a ten-page response. [dkt item 247]   On January 26, 2011, JNL filed a response which, combined with attachments, exceeds 1,600 pages ("JNL Response"). [dkt items 253-54, 256]   On January 31, 2011, the Examiner filed an eight-page reply. [dkt item 257]

Although JNL and the Committee substantially and at times vociferously disagree with the Examiner's methodology, capability, observations, and conclusions,[7] and although those voluminous responses remain under consideration for purposes of this Court's ultimate ruling on the Trustee Motion, the responses make clear that neither JNL nor the Committee should be in the position of acting as fiduciaries on behalf of the JNL bankruptcy estate in the investigation, commencement and prosecution of certain claims and causes of action that are or may be property of the JNL bankruptcy estate.

Further, much of the focus of JNL's and, somewhat surprisingly, the Committee's responses, was an attack on the Examiner's stated perspective on TFC's knowledge of various transactions and transfers.   Even though the Examiner clearly was not investigating TFC's knowledge to any significant degree,[8] a substantial amount of energy in both responses is on

---

[7] For example, the Committee claims that "the Examiner's findings and conclusions, which are heavily biased in favor of TFC, are faulty and should not be considered by the Court in determining whether to appoint a Trustee to operate Debtor's business." [Committee Response, dkt item 248 ¶ 11] Also, it claims "The Examiner fails to account for the legitimate business purposes of the affiliates and the transfers to and from them which enabled JNL to operate its business profitably." [Committee Response, dkt item 248 ¶ 18]

[8] The Examiner's Report states:

> The Debtor selected Ron Pagatto as an individual that they wanted me to interview, then subsequently the Debtor and Committee counsels asked that I additionally interview Paul Cottone. The purpose of the TFC interviews was principally to establish the extent of TFC's knowledge primarily with regard to the transfers of cash to outside entities. I did not read this to be relevant to the requirements of the Examiner's Order and therefore outside the scope of the investigation. Nevertheless, the Committee and the Debtor asked me to pursue the issue generally and TFC had no objection so I have included this in the report.

[dkt item 209, p. 19]

"what did TFC know and when did TFC know it."[9]    JNL and the Committee seem to rivet and pivot on the words "Alleged *diversions* by Forgione"[10] and "using the proceeds of TFC's revolving loan advances to Debtor" in charges A and B of the Examiner Order, but seem to ignore "Alleged loans made by Debtor of millions of dollars to entities allegedly owned and/or controlled by the Debtor and/or Forgione personally" in charge D.[11]    JNL and the Committee essentially ask that this Court ignore whether certain transfers and transactions occurred and focus only on what TFC knew was happening or allowed to transpire.

By way of example, in JNL's response to the Examiner's Report, JNL states:

[F]rom August 19, 2007 through and including May 8, 2010, JNL requested and received from TFC 65 withdrawals against the Facility, by means of Notices of Borrowing, each accompanied by a [borrowing base certificate] requesting a withdrawal from the Restricted Account for use as a capital distribution to or as directed by JNL's shareholder, Forgione. Each of these 65 BBCs (JNL Ex. H) aggregating $6,824,570, was reviewed and approved by TFC, which then transmitted the requested funds to JNL's operating account and increased the amount outstanding on the Facility accordingly.

---

[9]  For example, JNL's Response complains: "The Examiner 'concluded that during the Period, at least $26,399,285 of the proceeds of TFC's Revolving Credit Facility advances were transferred to Joseph G. Forgione ("Forgione"), JNL's President, and entities owned and/or controlled by Forgione. During the same Period, $15,672,329 was transferred to JNL by these same entities. Therefore, a net cash transfer of at least $10,726,956 from JNL Funding Corp. to Forgione entities took place during this time.' . . . This conclusion is meaningless in the context of the TFC Trustee Motion. The basic flaw in the Examiner's Report is that he deems irrelevant, and only grudgingly addresses, the question of whether or not JNL was permitted to make any or all of the draw downs from the TFC Facility and whether it was permitted to distribute those funds for any purpose other than making new loans." [JNL Response, dkt item 252 ¶¶9-10]

[10]  In fact, the Committee states that "the Examiner fails to distinguish between inappropriate "diversions" of JNL's assets and simple transfers of assets for legitimate business purposes. The Examiner seems to use the phrase "net transfers" to describe all transaction in an attempt to tar all of JNL transfers to any outside entity as a "diversion" of JNL assets, when, in fact, the documentation supports that these were legitimate business transfers." [Committee Response, dkt item 248 ¶16]

[11]  JNL and the Committee also attack the Examiner's use of the term affiliate as being too expansive.   However, as noted in his Reply, "The Examiner Order provided an operative definition of an affiliate, and I specifically obtained further guidance on this very subject from the Court on October 19th, 2010."   [dkt item 257, p. 3]

[dkt item 252 ¶ 35][12]    JNL seems far more concerned by TFC's alleged knowledge of JNL's potential disposition of nearly $7 million within three years prior to the Petition Date than with the fact the JNL may have disbursed nearly $7 million either as capital distributions or as otherwise directed by Mr. Forgione within three years prior to the Petition Date.

Exploring TFC's knowledge was not a central component of the Examiner's charge, and is not central to whether a chapter 11 operating trustee should be appointed based on allegations, *inter alia*, that JNL engaged in "seriously misleading and perhaps fraudulent activities and transactions with insiders, affiliates and other related and unrelated third parties, all of which provided no identifiable, tangible or intangible benefit or consideration to the Debtor or its creditors."[13]    Further, whether JNL made certain transfers or entered into certain transactions prior to the Petition Date with non-debtor entities and, specifically, with affiliates of JNL and Mr. Forgione, that may give rise to certain claims and causes of action that are property of the JNL

---

[12]    JNL justifies the use of the nearly $7 million because "[a]t the commencement of the TFC Facility in August 2006, JNL had capital in excess of $20 Million contributed by Forgione. The source of this equity was Forgione's personal assets including the proceeds of loans to Forgione from the Note Holders. Under the Loan Agreement, the only way for JNL to access any of its capital or profits was by means of a Notice of Borrowing requesting TFC consent to a withdrawal from the Restricted Account." [JNL Response, dkt item 252 ¶ 27]

[13]    Specifically, the Examiner states in his response:

> My view of the TFC knowledge issue has essentially remained the same from the beginning of the investigation. There is nothing in this Court's Decision and Order Directing the Appointment of an Examiner dated August 26, 2010 (the "Order") which directs me to adjudicate this question. There is no ambiguity or any possible interpretation in any of the ordered areas of inquiry that could be construed as directing this, and I shared this view with all parties at the outset. In fact, I wrote to the Committee's counsel asking him to let me know if he interpreted the Order differently and he never responded to the question. However since two of the three constituents wanted this question addressed, and since the third constituent didn't object to resources being applied to this, I did investigate and included in the Report a finding that TFC knew that distributions were taken. What was also clearly outside the scope of the Order was any finding as to whether these transfers were legitimate, or not, and I have made no findings in that respect. My Report of the movement of cash amongst these entities is factual. It falls to others to draw conclusions as to legitimacy and whether this is modified by knowledge.

[dkt item 257 p. 4]

bankruptcy estate will in many or most instances have little or nothing to do with TFC's knowledge or lack thereof of such transfers and transactions.

### *Pre-Petition Transfers That Require Further Investigation and Potential Litigation*

In its response, JNL further describes the capital distributions from JNL's pre-petition operating account to what the Examiner termed Controlled Affiliates.[14]   These entities and persons are Mr. Forgione personally, sometimes referred to as "DBA," Centurion Financial, Centurion Settlement Services, LLC ("Centurion Settlement"), and 1st Republic.   JNL states that "[t]he transfers to DBA totaled $1,654,000 and constituted capital distributions permitted by TFC." [dkt item 252 ¶ 65]   Again, JNL provides no statement as to the propriety as to creditors generally of Mr. Forgione personally taking $1,654,000.00 in capital distributions during the Period.

As to Centurion Financial, JNL states it

> [I]s a South Carolina Corporation, licensed by South Carolina as an insurance company . . . [and] is a wholly owned subsidiary of Joseph Gerard Capital, Ltd., a New York corporation owned by the Trust.   Centurion issued insurance policies to JNL insuring against the risk of loan defaults on JNL's loans to its borrowers, and TFC was aware of this prior to the Filing Date. . .. Payments to Centurion Financial during the Period totaled $2.8 Million. During the same Period, Centurion Financial paid JNL $3.3 Million . . . in insurance benefits.

[dkt item 252 ¶ 66]   Not only does JNL seem to be equating the fact that payments were made under credit default insurance policies as reasonably equivalent consideration for premiums paid

---

[14] JNL states: "The Examiner (R. 30) identifies transfers during the Period from JNL to Forgione personally in the amount of $114,000 and to the DBA account in the amount of $11,174,000, with $4,058,000 having been paid from the DBA accounts to JNL's Restricted Account, for net transfers to Forgione and DBA of $7,230,000. These transfers were consistent with the practice between JNL and TFC of capital distribution withdrawals . . . and each of these withdrawals was approved by TFC and documented as discussed above. . . . As the Operating Account Cash Analysis (R. 30) in the Examiner's Report shows, during the Period, JNL received $149,581,000 from the Restricted Account as loan advances by TFC used by JNL for loans to its customers, operating expenses, and capital distributions, and repaid TFC $118,550,000 during the worst real estate market in more than 50 years. TFC filed a proof of claim (JNL Ex. O) for $31,240,766 which is the approximate difference between the TFC loan advances and JNL payments to TFC during the Period." [JNL Response, dkt item 252 ¶¶54-55]

for the issuance of such insurance policies, JNL seems more concerned with TFC's knowledge than with whether any of the $2.8 million in payments to an affiliate might be the subject of an appropriate claim by the JNL estate.

As to Centurion Settlement, JNL states it "is owned by Forgione and in 2009 provided settlement services for the closings of sales of mortgaged properties and was used to do reloads."[15] [dkt item 252 ¶67]   JNL further states that "prior to 2009, there was no material activity" with Centurion Settlement, and "there were 14 payments totaling $1,948,713 and each payment was identified with a mortgaged property. The Examiner acknowledges that these funds were used to repay JNL loans that were about to become ineligible and were replaced with new loans. As indicated in the Marcum Report . . . the Examiner does not clarify that $1,703,268 of this total was repaid by Settlement to JNL (which the Examiner notes separately)." [dkt item 252 ¶67] However, JNL does not address whether the approximate $250,000.00 apparently paid to an affiliate closer in connection with less than $2 million of mortgage transactions might give rise to a claim or cause of action.

Finally, as to 1st Republic, the JNL Response notes that JNL paid 1st Republic management fees in an unstated amount, but which "were known to TFC and properly recorded by JNL. These fees also were approved by TFC." [dkt item 252 ¶ 68]   The Examiner Report states that "1st Republic contributed $4.1 million net over the Period to the DBA account. During the same Period it received $2.0 million net from JNL." [dkt item 209, p.54]   The Committee Response includes a response   by Marcum that contradicts the amounts stated by the Examiner as transactions flowing through the DBA account and as paid to 1stRepublic directly or indirectly by JNL, but is difficult

---

[15] This Court is not addressing the reloads with any specificity in this Order.

to follow.[16]

The Examiner also examined loans made to Affiliated Entities as he categorized them. The Examiner concluded that JNL was owed approximately $25.5 million in loans outstanding as of the Petition Date by various Affiliates.   He identified thirty (30) entities as Owned Affiliates, being entities "in which Forgione or the Joseph G. Forgione 2003 Family Trust or Forgione family members hold an ownership interest." [dkt item 209, pp. 23-25]   Of this $25.5 million, the Examiner identified a nearly $7 million loan balance owed to JNL by the Owned Affiliates as of the Petition Date. [dkt item 209, pp. 77-81]

As for Controlled Affiliates, the Examiner identified a nearly $11.5 million loan balance owed to JNL as of the Petition Date. [dkt item 209, pp. 77-81]   The Examiner defines these as consisting of 1151 Loring Ave. Corp., Stoneleigh Woods at Riverhead, LLC, and Windswept Properties.   JNL states these entities are "owned by Robert Havasy or George Heinlein, who are co-owners of other entities with Forgione." [dkt item 252 ¶¶ 70, 77]

As for Related Affiliates, the Examiner identified a nearly $7.2 million loan balance owed to JNL as of the Petition Date. [dkt item 252 ¶¶ 70, 77]   The Examiner identifies the following seven entities as Related, which JNL describes as follows: 150 Newel Street Corp. and 363 Union Square Corp., which JNL states "are owned by Grant Havasy, the son of Robert Havasy who jointly owns or owned several properties with Forgione"; Huntsville Property Corp. and Smithbury Property Corp., which JNL states are both owned by Jason Foster who "has done construction work for JNL, and we understand that Foster has also inspected borrowers' ongoing construction projects for JNL"; Melrac Realty Corp., which JNL states is owned by Brian

---

[16] The Marcum Report is not at the height of clarity on this issue. The Marcum Report misstates the Examiner Report's numbers related to the 1stRepublic transactions, and provides differing and difficult-to-follow explanations for the JNL and DBA transactions with 1stRepublic. [dkt item 248-1, p. 28]

Fullerton, who "has done construction work for JNL, worked on Stoneleigh Carmel project, and briefly was President and owner of Quail Run"; Mortgage Resolution Corp., which JNL states is owned by Tim Mayette, CFO of JNL; and Strathmore Lane Corp., which JNL states is owned by Philip Cepra, the JNL appraiser "approved by TFC." [dkt item 252 ¶¶ 71, 72]

### *Transactions With the Noteholders*

As for transactions with the Noteholders, JNL states that the Examiner concluded that during the Period, JNL " 'made net transfers to the . . . [DBA] account of approximately $5.5 million' and payments out to the Note Holders from the DBA account totaling $10,216,136." [dkt item 252 ¶ 79]   JNL again criticizes the Examiner for not "investigating TFC's and TD Bank's knowledge of the transactions.   [dkt item 252 ¶ 79]   Again, whether TFC knew of these transactions with the Noteholders is not determinative of whether JNL entered into "transactions with insiders, affiliates and other related and unrelated third parties, all of which provided no identifiable, tangible or intangible benefit or consideration to the Debtor or its creditors."

### Analysis

A party seeking appointment of a chapter 11 trustee bears the burden of showing by "clear and convincing evidence" that the appointment of a trustee is warranted. *In re Bayou Group, LLC*, 564 F.3d 541 (2d Cir. 2009); *see also In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005); *In re Taub*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006).   In determining whether appointment of a chapter 11 trustee is warranted or in the best interests of creditors, the bankruptcy court "must bear in mind that the appointment of a trustee may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code, by incurring the expenditure of substantial

administrative expenses caused by further delay in the bankruptcy proceedings." *Bayou Group*, 564 F. 3d at 547; *Taub*, 427 B.R. at 225;

In a Chapter 11 reorganization case in which the court does not order the appointment of a trustee, the court may order the appointment of an examiner to conduct an investigation of the debtor, if such an appointment is in the interests of creditors, any equity security holders, and other interests of the estate, or if the debtor's fixed, liquidated unsecured debts, other than for goods, services, or taxes, exceed $5 million. *See* 11 U.S.C. § 1104(c); *see also, e.g.*, *In re FiberMark, Inc.*, 339 B.R. 321 (Bankr. D. Vt. 2006).   This Court so determined in the Appointment Order.

An examiner appointed under Section 1104(d) is required to:

(1) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(2) as soon as practicable, file a statement of any such investigation, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate;

(3) as soon as practicable, transmit a copy or a summary of the statement of such investigation to any creditors' or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates; and

(4) except to the extent that the court orders otherwise, perform any other duties of the trustee in a Chapter 11 case that the court orders the DIP not to perform.

11 U.S.C. § 1104 (d).   Section 1106(b) provides that an examiner appointed under Section 1104(d) may have its powers expanded by the Court.[17]   *In re Texasoil Enterprises, Inc.,* 296 B.R. 431 (Bankr. N.D. Tx. 2003).

### The Examiner's Powers Should Be Expanded to Continue Investigation of and to Commence Litigation Where Appropriate to Benefit the JNL Bankruptcy Estate

The Examiner's powers should be expanded in certain circumstances to continue investigation of and to commence litigation where appropriate to benefit the JNL bankruptcy estate.   This Court is not concluding that avoidable or recoverable transfers have occurred; however, the Examiner's investigation and work product reveal that claims and causes of action may exist that may be of benefit to the JNL estate.   Because of JNL's and Mr. Forgione's relationships with the potential defendants, and JNL's adamant support of the transfers and transactions, JNL is not the proper vehicle to act as fiduciary for the JNL estate in regards to certain potential claims.   Further, the Committee cannot act as an independent fiduciary with respect to its own constituent Noteholders and those who are similarly situated,. The Committee serves on behalf of unsecured creditors of both estates, and the claims involving the Noteholders that may benefit the JNL estate may be at odds with the Noteholders claims against JNL, and the defenses that may be asserted by Noteholders if suit were brought on behalf of the JNL estate may inure to the detriment of creditors of the JNL estate but to the benefit of creditors of the Individual Case.   Further, given the Committee's adamant support of the transfers and transactions investigated and its vociferous attack upon the Examiner's work, the Committee is not the proper vehicle to act as estate fiduciary with respect to certain potential claims.

---

[17] Specifically, "An examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section, and, except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform." 11 U.S.C. § 1106 (b).

This Court possesses the power to and will order the Debtor not to file any suits against any of the Owned Affiliates, Controlled Affiliates, Related Affiliates, or Noteholders, as defined and described in the Examiner's Report.    Instead, this Court will vest such authority in the Examiner, and hereby orders the Examiner to continue his investigation of the transfers and transactions described or discussed in his Examiner's Report, determine if the JNL bankruptcy estate may benefit by the pursuit of any claims or causes of action, and file such suits if deemed appropriate by the Examiner in the exercise of his independent judgment, acting as a fiduciary on behalf of the JNL bankruptcy estate.    The Examiner shall also have authority to settle any such claims or causes of action, with or without filing suit, if deemed appropriate by the Examiner in the exercise of his independent judgment, acting as a fiduciary on behalf of the JNL bankruptcy estate; provided, however, that any such settlements shall be subject to notice and opportunity for hearing and the strictures of Rule 9019 of the Federal Rules of Bankruptcy Procedure, and the case law applicable thereunder.

Moreover, as previously stated in prior orders, this Court possesses the power and ability to enter such orders as are appropriate to control the cases before it, to discourage wasteful pre-trial activities, to improve the quality of the trials through more thorough preparation, and to hold such conferences with the parties and enter such Orders as are appropriate for, *inter alia*, facilitation of the just, speedy and inexpensive disposition of pending matters. *See* FED. R. CIV. P. 16(a), (c)(2)(P); FED. R. BANK. P. 7016, 9014.    No further discovery shall be had and no further investigation shall be conducted in connection with any of the potential claims and causes of actions hereby delegated to the Examiner, except by the Examiner or his professionals.

As requested by the Examiner at a hearing held on February 1, 2011, he shall have a period of seven (7) days from entry of this Order to file a letter accepting or declining the responsibilities delegated to him thereunder.   If the Examiner declines such delegation, this Court will hold a hearing to determine whether to vacate or modify its order herein, and to determine the control and management of claims and causes of action against any of the Owned Affiliates, Controlled Affiliates, Related Affiliates, or Noteholders.

### Order Expanding Powers of the Examiner

Based on the foregoing, it is hereby

ORDERED, that the Debtor is hereby Ordered not to file any suits against any of the Owned Affiliates, Controlled Affiliates, Related Affiliates, or Noteholders as defined and described by the Examiner in his Report; and it is further

ORDERED, that the Examiner shall continue his investigation of the transfers and transactions described or discussed in his Examiner's Report involving any of the Owned Affiliates, Controlled Affiliates, Related Affiliates, or Noteholders, determine if the JNL bankruptcy estate may benefit by the pursuit of any claims or causes of action, and file such suits if deemed appropriate by the Examiner in the exercise of his independent judgment, acting as a fiduciary on behalf of the JNL bankruptcy estate; and it is further

ORDERED, that the Examiner shall also have authority to settle any such claims or causes of action, with or without filing suit, if deemed appropriate by the Examiner in the exercise of his independent judgment, acting as a fiduciary on behalf of the JNL bankruptcy estate; provided, however, that any such settlements shall be subject to notice and opportunity for hearing and the

strictures of Rule 9019 of the Federal Rules of Bankruptcy Procedure, and the case law applicable thereunder; and it is further

ORDERED, that no further discovery shall be had and no further investigation shall be conducted in connection with any of the potential claims and causes of actions hereby delegated to the Examiner, except by the Examiner or his professionals.; and it is further

ORDERED, that the Examiner shall have a period of seven (7) days from entry of this Order to file a letter accepting or declining the responsibilities delegated to him hereunder; and it is further

ORDERED, that if the Examiner accepts the powers granted and responsibilities delegated hereunder, all of the following shall also occur:

A.  The Examiner shall have the continuing authority to issue subpoenas and to require document production and conduct examinations under Rule 2004 of the Federal Rules of Bankruptcy Procedure into any matter the Examiner deems necessary and relevant to the complete and full investigation and discharge of his duties hereunder, provided the Examiner exercises this authority in a manner which is consistent with the Examiner's obligation to act in a prompt and cost-effective fashion;

B.  JNL and its employees shall cooperate fully with the Examiner, and shall meet with the Examiner upon reasonable written request without the need for a subpoena;

C.  the Official Committee of Unsecured Creditors and its members shall cooperate fully with the Examiner, and shall meet with the Examiner upon reasonable written request without the need for a subpoena;

D.  TFC and its employees shall cooperate fully with the Examiner, and shall meet with the Examiner upon reasonable written request without the need for a subpoena; in addition, TFC shall make available to the Examiner the online database previously made available by TFC to the Examiner, Debtor and the Committee to continue to review various documents;

E.  RAS Management Advisors LLC, financial advisor to TFC, and its employees, shall cooperate fully with the Examiner, and shall meet with the Examiner upon reasonable written request without the need for a subpoena;

F.   Marcum LLP, financial advisor to the Committee, and its employees shall cooperate fully with the Examiner, and shall meet with the Examiner upon reasonable written request without the need for a subpoena;

G.   "cooperation" in this Order includes but is not limited to the above identified persons providing to the Examiner, upon his / her request, all work papers, reports and findings or preliminary findings prepared in connection with any review, audit, analysis, investigation or examination of JNL and relevant transactions made from and after January 1, 2006, forward, excluding only attorney work product and attorney-client privileged communications;

H.   during the period of time that the Examiner is conducting his or her investigation, or while any such suit is pending, no estate professional shall conduct any investigation into or analysis of the matters made the subject of the Examiner's responsibilities as set forth herein for which compensation is sought from this estate; any such investigation shall not be compensated by this Court, as such would be duplicative of the Examiner's role and duties under Sections 1104 and 1106 for which the Examiner would seek compensation under Section 330 of the Bankruptcy Code; and

I.   A status conference shall be held with this Court on **March 30, 2011, at 9:30 a.m.** with the Examiner to discuss the progress of the Examiner on his continued investigation.



**Dated: February 10, 2011**
**Central Islip, New York**

_____
**Alan S. Trust**
**United States Bankruptcy Judge**